### THE KOMILES.

### THE RUSSELL NO. 4.

### BALTIC SEA STATES S. S. LINE v. THE RUSSELL NO. 4 et al.

### LEHIGH VALLEY R. CO. v. SAME.

### BALTIC SEA STATES S. S. LINE v. THE L. V. 125 et al.

District Court, S. D. New York.
July 5, 1940.

195

Hatch & Wolfe, of New York City (Carver W. Wolfe, of New York City, of counsel), for libellant Baltic Sea States S.S. Line.

Pyne & Lynch, of New York City (Warner Pyne, of New York City, of counsel), for cross-claimant and cross-respondent.

Alexander, Ash & Jones, of New York City (Edward Ash, of New York City, of counsel), for petitioners.

COXE, District Judge.

These suits grow out of a collision between the Russian motor vessel Komiles and the deck scow L. V. No. 125, in tow of the tug Russell No. 4, which occurred in Hell Gate, near Negro Point, on April 23, 1938, at about 2:24 A. M.

The tide at the time was flood, the weather clear, and there was a northerly wind blowing with a velocity of about 27 miles an hour.

The Komiles was bound from Boston for Claremont, N. J., and was proceeding west down the East River. The Russell No. 4, with the L. V. No. 125 in tow, was bound from the foot of East 96th Street, Manhattan, for Flushing, L. I., and was proceeding east up the East River. The vessels were, therefore, on meeting courses.

It is undisputed that there is a well recognized custom with respect to navigation in Hell Gate, in the vicinity of Negro Point, which requires vessels to pass starboard to starboard on the flood tide.

The main contention of the Russell tow is that the Komiles was attempting to pass port to port contrary to this custom. For the Komiles it is insisted that the Russell No. 4 was at fault for sounding a cross signal, and for not stopping and reversing her engines promptly.

There are two libels, namely, (1) by the owner of the Komiles against the Russell No. 4, and her owner, and (2) by the operator and charterer of the L. V. No. 125 against the Russell No. 4 and her owner. The Komiles has been impleaded in the second of these suits, and her owner has filed a cross-libel against the L. V. No. 125 and her owner and charterer. The owner and the charterer of the Russell No. 4 have also commenced limitation proceedings with respect to that vessel. The suits have been tried together, and will be disposed of in one opinion.

The Komiles is a single screw cargo vessel powered by Diesel engines, and was in ballast at the time of the collision; she is 364½ feet long, 51½ feet beam, and has a gross tonnage of 3961.83. The Russell No. 4 is 84.4 feet long, 22 feet beam, and has 300 horse power. The L. V. No. 125 is an open deck scow 111.2 feet long, 33.2 feet beam, and had at the time of the collision a deck cargo of 24 steel containers filled with cement.

The Russell tow left the racks at the foot of East 96th Street, Manhattan, at about 2 A. M. on April 23, 1938. The L. V. No. 125 was made fast on the port side of the tug, with her stern about even with the stern of the tug; she was being towed bow first, with the port side of the tug against her starboard side; and her bow projected about 27 feet beyond the tug's bow.

The tug was showing regulation running and towing lights. McCloskey, the master, was at the wheel, and Anderson, a seaman, was acting as a lookout in the pilot house. The L. V. No. 125 was in charge of Michelsen, an experienced lighter captain, and there were two lighted kerosene lamps on the deck, one on the port bow corner and the other on the port stern corner.

The tug and tow proceeded with the tug's engines hooked up, which, it was estimated, gave a speed over the ground of about four miles. The tow passed to the north of Mill

Rock, and, before reaching Hog Back, the tug blew a bend signal of one long blast. No bend whistle was heard from the Komiles. Captain McCloskey testified that when he was in the vicinity of Hog Back he saw the green light and staff lights of the Komiles between the two bridges and over towards the Astoria shore. Similar testimony was given by Anderson, the lookout. Soon afterwards the Komiles blew a one whistle signal for a port to port passage. Captain McCloskey thought the Komiles was then about 400 feet away. This one whistle from the Komiles was immediately answered by the tug with two whistles and an alarm, the rudder was placed hard left in an effort to get the tow into the slack water at Negro Point, and the engines were continued hooked up. Just before the collision the engines were placed full speed astern.

The Komiles struck the starboard side of the L. V. No. 125 about a quarter of the way back from the bow, parting the lines, and forcing overboard part of the deck cargo. There was also some damage on the port bow of the Komiles a short distance from the stem. After the collision the L. V. No. 125 drifted up the river, and was picked up by the tug between the two bridges. All of the witnesses for the tug testified that the collision took place under the red light on the Triborough Bridge, which is about 180 feet off from the Ward's Island shore.

The only witness for the Komiles who testified at the trial was Breakey, the pilot; the other witnesses were examined by deposition, and their testimony in some respects differed radically from that of Breakey.

The log of the Komiles shows that the vessel stopped at City Island at 1:19 A. M. to take on a pilot. Breakey, the pilot, came on board at 1:21 A. M., and the vessel then proceeded at full speed down the East River. It was estimated that at this speed the vessel was making 5 or 6 knots over the ground against the tide. Elisariev, the master, Gasse, the first mate, Gurilev, the second mate, Michailov, the wheelsman, and Breakey, the pilot, were on the bridge. Later, and at about 2 A. M., Gasse, the first mate, went to the forecastlehead to make ready the windlass, and he remained there until after the collision. There was also a lookout, Tcikishvilli, stationed at the forecastlehead.

All of the witnesses for the Komiles testified that the vessel proceeded down the right side of the river; Breakey said that the course was not more than 200 to 300 feet off Ward's Island. The bend signal of one long blast was blown above the Railroad bridge. No one heard the bend signal from the Russell No. 4. After the bend signal had been given, the Komiles started to haul in towards the Ward's Island shore. When the vessel was near the Triborough Bridge, the red light and staff lights of the tug were seen about three points on the starboard bow. The Komiles then blew one whistle to the tug, and the engines were changed to slow ahead. At the same time, the rudder was moved about two points to the right. The one whistle signal of the Komiles was answered by the Russell No. 4 with two whistles, after which the engines of the Komiles were placed full speed astern and alarms were sounded.

The navigation of the Russell tow after the one whistle of the Komiles, as indicated by the diagram vouched for by the Russian witnesses, is too fantastic to require any extended comment; it not only shows the tug making three complete changes of course in the short interval prior to the collision, but it also places the L. V. No. 125 in a position in which the conceded damage on her starboard side could not have occurred. Breakey, the pilot, completely disagreed with any such theory of the collision, and his diagram showing the relative positions of the vessels at the time of contact is not much different from that of Michelsen, the captain of the L. V. No. 125; both diagrams show the starboard side of the Komiles forming a wide angle with the starboard side of the L. V. No. 125.

The witnesses for the Komiles fixed the place of collision west of, or below, the Triborough Bridge. Elisariev, the master, marked the point of collision on the chart at about 250 feet west of the bridge; Gasse, the first mate, at about 75 feet; and Michailov, the wheelsman, at about 300 feet. Breakey, the pilot, said the bow of the Komiles was 400 feet west of the bridge at the time of the collision. Tciktishvilli testified, however, that the bridge was over the stern of the vessel when the collision occurred.

The following findings are made with respect to the Russell No. 4: The navigation was in accordance with the custom in Hell Gate on the flood tide; this required the tug to keep close to Negro Point and pass the Komiles starboard to starboard. The bend signal was given before reaching Hog Back. No bend signal was, however, heard

from the Komiles. The lights of the Komiles were first seen after the tow had passed Hog Back; the Komiles was then between the bridges and on the northerly side of the river. Soon afterwards, the Komiles blew one whistle, which the tug at once answered by two whistles and an alarm, at the same time placing the rudder hard left. The collision took place under the red light on the Triborough Bridge about 180 feet off from the Ward's Island shore.

There are still some findings to be made with respect to the navigation of the Komiles. The bend signal was given a short distance above the Railroad bridge. The vessel was then near the middle of the river, but afterwards commenced to haul towards the Ward's Island shore. The bend signal of the Russell tug was not heard. When the Komiles was near the Triborough Bridge the lights of the tug were seen about three points on the starboard bow. I think at that time the Komiles was farther from the Ward's Island shore than her witnesses were willing to admit; otherwise it is difficult to account for the angle of the collision, or to allow for the vessel's subsequent starboard swing. When the tow was seen, the Komiles blew one whistle, changed to slow speed, and moved the rudder about two points to the right. After the answering two whistles from the tug, the engines were placed at full speed astern, and alarms were sounded. The collision occurred at a fairly wide angle at the point already indicated.

■ First: I think the Komiles was at fault for attempting a port to port passage. The established custom for the navigation of vessels in Hell Gate, in the vicinity of Negro Point, requires a starboard to starboard passage on the flood tide. This custom was proved at the trial, and is not disputed. It has also been recognized by a long line of cases in this circuit. The Transfer No. 21, 248 F. 459; The Nassau, 35 F.2d 709; The Authentic, 90 F.2d 437; The Portchester, 94 F.2d 644. If the west bound vessel desires a port to port passage, she must hold back above Negro Point until the east bound vessel has cleared Negro Point. The Authentic, supra. The Komiles followed neither of these alternatives.

The excuse offered by the Komiles is that she had no knowledge of the approach of the tow until the lights of the tug were seen when she was near the Triborough Bridge. But even at that point, the Komiles could still have passed to starboard if she had acted promptly. Instead, she blew one whistle to the tug, and went farther to her starboard.

It is apparent, also, that the Komiles had an insufficient lookout. He was stationed at the forecastlehead, 150 feet from the bridge, yet he saw nothing that had not already been seen by the bridge. Breakey, the pilot, admitted that he received no report from the lookout. This may well be accounted for by the fact that Breakey could not speak Russian, and the lookout could not speak English. But whatever the explanation, it cannot be said that the failure to report did not contribute to the collision.

■ Second: The question remains whether the Russell No. 4 was also at fault for her cross signal, and for failing to stop and reverse. In The Fulton, 2 Cir., 54 F. 2d 467, it was held a fault to cross a signal in a meeting situation. This ruling has recently been extended to cover the case of a privileged vessel in a crossing situation. Postal S.S. Corp. v. The El Isleo, 308 U.S. 378, 60 S.Ct. 332, 84 L.Ed. 335; Postal Steamship Corp. v. Southern Pacific Company, 2 Cir., 112 F.2d 297, decided by the C. C. A. Circuit, June 3, 1940. I do not think that the doctrine of these cases applies to the facts of the present case. Clearly, the master of the Russell No. 4 was in no position to accept a port to port passage after the one whistle from the Komiles. I do not believe, either, that with the strong following tide he could have avoided a collision by stopping and reversing. His only chance was to try and reach the slack water at Negro Point. He failed because of the starboard swing of the Komiles. I think, therefore, that the case falls within the exception to the general rule noted in The Fulton, supra, at page 469, of 54 F.2d, where it was said that the failure to stop and reverse would be excused on a showing "beyond a doubt that it could not have avoided the collision". See The Richard J. Barnes, 2 Cir., 111 F.2d 294.

There may be decrees in favor of the tug Russell No. 4 and the scow L. V. No. 125, and against the motor vessel Komiles, in all of the cases, and dismissing the libels of the owner of the Komiles, all with costs to the successful parties.